## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAUL McKERNAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN A. PALAKOVICH, et al.** | : | **No. 06-2118** |

**Norma L. Shapiro, J.**                                              **October 22, 2014**

### MEMORANDUM AND ORDER

Before the court is Paul McKernan's federal *habeas corpus* petition filed under 28 U.S.C. § 2254. Magistrate Judge Thomas Reuter ("Magistrate Judge") filed a Report and Recommendation ("R&R") that the petition be denied. The petition for writ of *habeas corpus* will be denied but a certificate of appealability will be issued.

### I.      BACKGROUND

#### A.      Court of Common Pleas Trial

After a three-day non-capital bench trial, Philadelphia County Court of Common Pleas Judge Lisa Richette ("Judge Richette") found Paul McKernan ("McKernan") guilty of first-degree murder of Mark Gibson ("Gibson"). Gibson was found to have suffered two blunt force injuries consistent with two blows from an aluminum baseball bat. N.T. 7/14/98 at 93. McKernan was sentenced to mandatory life imprisonment without parole. N.T. 7/16/98 at 574–75.

McKernan and Gibson were former roommates at McKernan's house. Gibson moved out of McKernan's house but left some of his personal belongings and a television cable box. On September 17, 1997, Gibson and his brother-in-law, Joseph Rogers ("Rogers"), went to McKernan's house to retrieve the cable box. McKernan refused to return it and claimed Gibson

owed him money.  The agreement escalated to a physical confrontation.  McKernan picked up an aluminum baseball bat, and Gibson subsequently retrieved a mechanic's screwdriver or crowbar from his car.  With weapons in hand, each man threatened to break the windows of the other's car.  Gibson approached McKernan and threatened to take the bat from him.  McKernan swung the bat at Gibson, and the men grappled.  After a brief struggle, they released each other.

Gibson then told McKernan he would return for the cable box.  Rogers walked to the driver's side of Gibson's car so he and Gibson could depart.  Rogers observed Gibson, with his back to McKernan, reach to open the passenger-side door.  He then heard a loud thump, saw Gibson on the ground, and got out of the car to assist Gibson.  McKernan told Rogers he hit Gibson in the chest.  Rogers, observing that Gibson was bleeding profusely, asked McKernan to call an ambulance.  McKernan replied, "fuck him, he got what he deserved."  N.T. 7/14/98 at 168.

The medical examiner testified Gibson died of blunt force injuries consistent with two blows with an aluminum baseball bat: one behind the right ear and one to the lower back.  N.T. 7/14/98 at 93.  David Thompson ("Thompson"), a defense witness, corroborating the testimony of the medical expert, stated that he had witnessed McKernan strike Gibson in the back of the head when Gibson attempted to enter the car.  N.T. 7/16/98 at 371.  McKernan testified he struck Gibson in the chest in self-defense, and the resulting fall caused Gibson's head injury.  *Id.* at 457.

The Commonwealth rested its case after the first day of trial.  N.T. 7/14/98 at 195.  On the second day, before hearing defendant's case-in-chief, Judge Richette summoned the victim's mother, Beatrice Gibson, to the judge's robing room for a conference with Mark Gilson, Esq., the assistant district attorney, and Fred Harrison, Esq., defense counsel.  David Gibson, the victim's brother, joined the conference soon after it began.  N.T. 7/15/98 at 208.  The defendant was not

included until the conclusion of the conference. *Id.* at 241.

During this conference, a memorial website created by the victim's family ("Gibsons") was discussed. *Id.* at 201. The website contained commentary expressing the Gibsons' dissatisfaction with the prosecution, critical statements about Judge Richette and her reputation as a lenient judge, and a hearsay account of the altercation from the Gibsons' perspective. Judge Richette informed Mrs. Gibson she was "very disturbed" by the "vicious and unfair" website. *Id.* She then attempted to persuade the Gibsons that she sympathized with victims and supported victims' rights. *Id.* at 207-229. Judge Richette also praised the trial prosecutor, acknowledged the benefit of having an eye witness testify, and stated that Gibson's death was a "horrible, horrible murder." *Id.* at 211, 225, 231-232, 238. After their conversation with Judge Richette, the Gibsons apologized to Judge Richette, rejected her numerous offers to recuse, and told her they wanted to continue with her presiding at trial. *Id.* at 201, 203, 212, 215, 216, 229, 232, 235, 238. The transcript of the robing room conference is attached as Exhibit A.

At the conclusion of the trial judge's discussion with the Gibsons, the assistant district attorney asked defense counsel if he had any concerns about McKernan's ability to receive a fair trial. *Id.* at 235. Defense counsel requested permission to inform his client of the matters discussed. While defense counsel conversed with McKernan outside the robing room, David Gibson offered to remove anything offending Judge Richette from the website and suggested posting her thoughts on victimology. *Id.* at 236–37. Defense counsel then returned and the Gibsons left the chambers. Defense counsel explained to Judge Richette that McKernan was undecided about proceeding. *Id.* at 239. McKernan was concerned with the possibility that Judge Richette might "bend over backwards to prove [the victim's mother] wrong," which could prevent him from receiving a fair trial. *Id.* at 240.

3

At the court's request, McKernan then entered the robing room.  Judge Richette told

McKernan the conference with the victim's family was about the website–not the facts or the

merits of the case–and she was not going to let it influence her thinking.  *Id.* at 243-244.  She

asked McKernan if he had discussed the matter with his counsel and if he wanted to continue

with her presiding as judge.  *Id.* at 243.  McKernan answered affirmatively.  *Id.*  The assistant

district attorney explained that Judge Richette had provided the Gibsons with the opportunity to

request her recusal if they did not think the judge could be fair, and stated that McKernan had the

same opportunity.  *Id.* at 244.  After requesting to confer again with his counsel, McKernan

returned to court and waived his right to recuse Judge Richette.  *Id.* at 246-247.

**B.**     **Direct Appeal**

On direct appeal, McKernan: (1) challenged the sufficiency of evidence to support a

conviction of first-degree murder; (2) argued several instances of ineffective assistance of

counsel; and (3) challenged Judge Richette's decision not to recuse on the grounds of bias, but

did not raise this challenge as a federal constitutional violation.  *See* Appellant Br. Direct Appeal.

The Superior Court affirmed the conviction and sentence.  *Commonwealth v. McKernan*, 776

A.2d 1007 (Pa. Super. Ct. Feb. 16, 2001) (unpublished).  McKernan then filed a petition for

discretionary review by the Pennsylvania Supreme Court, but withdrew it on March 27, 2001.

*See* R&R at 2 (paper no. 14).

**C.**     **PCRA Petition**

On September 26, 2001, McKernan filed a *pro se* petition for review under

Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.*  After

several months with no response, he filed a federal petition for a writ of *habeas corpus*; this court

dismissed it without prejudice as unexhausted.  *McKernan v. Varner*, No. 02-7835, 2003 WL

4

21771738 (E.D. Pa. July 18, 2003).  The PCRA court later considered the PCRA petition and appointed McKernan counsel.

McKernan filed a counseled amended petition raising the following claims: (1) Fred Harrison, Esq. ("Harrison"), his appointed trial counsel, was ineffective for failing to call witnesses possessing exculpatory evidence; and (2) John Cotter, Esq. ("Cotter"), his appellate counsel, was ineffective for failing to investigate Harrison's ineffectiveness and failing to raise the issue on appeal.  Am. PCRA Pet. at ¶ 14.  McKernan also claimed his conviction and present imprisonment resulted from: (1) violation of the laws of the Commonwealth or the Constitution of the United States; and (2) ineffective assistance of counsel at trial, post-trial, and on appeal. *Id.* at ¶ 8.

During state collateral review, there was an evidentiary hearing to hear the testimony of three witnesses McKernan alleged would have supported his self-defense contention if they had been called at trial.  N.T. 12/15/03.  At this hearing, McKernan's state post-conviction counsel informed the court that after contacting the witnesses he determined the witnesses in question would not testify in conformity with their earlier statements supporting McKernan's self-defense claim.  *Id.* at 4, 8.  The PCRA court, dismissing the petition, found: (1) defendant "acknowledged that he had met with his trial counsel and counsel had done everything he had wanted him to do to prepare for trial"; (2) calling the other two witnesses "would have contradicted and undercut the testimony of [the] two [testifying] defense witnesses"; and (3) "defendant did not complain or ask that other witnesses be permitted to testify."  PCRA Ct. Op. at 2.

McKernan, appealing to the Superior Court, raised two issues: (1) his decision to refuse the trial court's recusal offer was not a knowing, voluntary, and intelligent waiver of a constitutional right because trial counsel failed to make him aware of Judge Richette's

prejudgment of the case as a "horrible murder"; and (2) trial, appellate, and post-conviction

counsel were ineffective for failing to raise and brief this precise issue.  Appellant Br. PCRA

Appeal.  McKernan did not state anywhere in the PCRA appeal that his waiver of Judge

Richette's recusal impacted or involved federal constitutional due process, nor did he mention

the Fourteenth Amendment.  Besides referring to the Supreme Court definition of "waiver" in

*Johnson v. Zerbst*, 304 U.S. 458 (1938), McKernan only cited Pennsylvania law and cases in

support of his argument that the trial judge's bias and failure to recuse were improper.

The Superior Court held McKernan could not raise his PCRA appeal issues because

counsel's ineffectiveness had been litigated previously, and under Pennsylvania law a PCRA

petitioner may not obtain relief based upon counsel's ineffectiveness by advancing a new theory.

PCRA Appeal Op. at 1, 5.  The court nonetheless considered the merits and concluded the trial

judge,  "was not so prejudiced or biased that her mind was not open to conviction by the last

evidence presented." *Id.* at 7.  The Superior Court affirmed the PCRA court's dismissal of the

petition, *id.,* and the Pennsylvania Supreme Court denied McKernan's petition for allowance

appeal.  *Commonwealth of Pa. v. McKernan*, 586 Pa. 709 (Pa. 2005).

### D.    Federal *Habeas* Petition

In May 2006, McKernan filed a *pro se* petition for a writ of *habeas corpus*.  *See Pro Se*

Habeas Pet. (paper no. 1).  He argued his trial counsel rendered ineffective assistance by: (1) not

interviewing and calling three witnesses at trial who would have provided testimony supporting

his self-defense claim; (2) calling a defense witness at trial who changed his testimony from his

earlier statements; and (3) failing to challenge whether the petitioner's waiver regarding recusal

of the trial judge was voluntary, intelligent, and knowing. *Id.* at 9.  In support of his first claim,

McKernan attached affidavits signed by Karl Jahr, Donna Jahr, and Florence M. Bast. *See Pro*

*Se* Habeas Pet., Ex. A/1, Ex. A/2, Ex. A/3, Ex. B, Ex. C/1, and Ex. C/2 (paper no. 1).

McKernan's petition was assigned to a magistrate judge, who recommended the petition be denied. *See* R&R (paper no. 14). The magistrate judge found that Claim 1 was procedurally defaulted because McKernan never presented it to the Pennsylvania Superior Court, and the one-year statute of limitations, 42 Pa. Cons. Stat. § 9545(b), prevented McKernan from raising it in a new PCRA petition. McKernan alleged that if his claims were held procedurally defaulted, the fundamental miscarriage of justice exception to the procedural default rule should apply because he was actually innocent of the crime for which he was convicted. The magistrate judge found the proffered affidavits were not sufficiently reliable because the witnesses who signed the affidavits either did not witness the confrontation between McKernan and Gibson, did not see where McKernan hit Gibson with the baseball bat, or provided statements inconsistent with the physical evidence. R&R at 11-13 (paper no. 14).

The magistrate judge found Claim 2 was properly preserved but failed on the merits because McKernan could not satisfy the two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). He found Claim 3 failed on the merits because McKernan could not show: (1) he would have requested recusal if he knew the specifics of the judge's statements during the robing-room conference; and (2) Harrison was ineffective when he advised McKernan the trial judge was likely to be as favorable a trier of fact as he could expect.[1]

McKernan filed *pro se* objections to the R&R, *see Pro Se* Obj. R&R (paper no. 25), and later appointed counsel filed amended objections. *See* Am. Pet'r's Obj. R&R (papers no. 38-40).

---

[1] Because Claim 3 failed on the merits, the magistrate judge did not to address whether McKernan properly exhausted it in state court. *See* 28 U.S.C. § 2254(b)(2).

McKernan argues any procedural default should be excused. *Id.* In his amended objections, McKernan argues counsel was ineffective for failing to seek and secure relief for the trial court's obvious bias and failing to investigate and present eyewitness evidence to rebut the Commonwealth's evidence of intent. McKernan also contends the state court's rejection of McKernan's ineffective assistance of counsel claim, based on the calling of Thompson, a witness who at trial recanted his earlier statement to the police, is contrary to or an unreasonable application of clearly established federal law.

This court held an evidentiary hearing on "facts that bear on the issue of whether petitioner's criminal trial is invalidated by structural error in the form of judicial bias." *See* Order (paper no. 27). At the hearing, Harrison testified: (1) Judge Richette was upset about the website, N.T. 11/24/08 at 8; (2) Harrison did not object to the robing-room conference or any of Judge Richette's comments because he had tried several cases before her successfully, was familiar with her "off-the-cuff" remarks, and thought she would be fair, *id.* at 12, 14, 18, 22, 59; (3) Harrison informed McKernan of the substance of the conference, *id.* at 27–28, 36, 37, 39, 41, 42; (4) Harrison did not object to Gilson's representation that the merits of the case were not discussed because he didn't believe they discussed the merits; he felt he had informed McKernan of everything he needed to know to make an informed decision, *id.* at 34, 36, 41, 45; and (5) he felt McKernan would fare best by continuing with the same trial judge because McKernan could have been reassigned a potentially more prosecution-friendly judge if he requested the recusal of Judge Richette, *id.* at 57, 61–62.

Gilson testified he too was familiar with Judge Richette's idiosyncracies and found her remarks to be insignificant. *Id.* at 106–07, 123–24. He testified: (1) Judge Richette's reputation as a lenient judge had been around for decades and in his experience it never affected how she

8

decided cases, *id.* at 127; and (2) he believed the robing-room conference would not influence Judge Richette, *id.* at 129.

McKernan testified Harrison: (1) informed him the persons in the robing-room conference discussed a newspaper article about "Let 'em Loose Lisa," *id.* at 81; (2) failed to inform him of any other details of the conference, *id.* at 81–85; and (3) advised him to stay with the judge on numerous occasions, *id.* at 82, 88, 89, but McKernan would have asked for a mistrial had he known all the details. *Id.* at 90, 96.

McKernan's counsel filed a motion to amend his petition for a writ of *habeas corpus*, without prejudice, on three grounds: (1) to add a separate claim that the trial court's bias was a presumptively prejudicial structural error violating due process; (2) to amend Claim 3 of the initial petition to conform to evidence elicited at the evidentiary hearing; and (3) to amend Claim 1 of the initial petition to incorporate "new evidence" relevant to establishing actual innocence. *See* Letter Regarding Proposed Amendments to Petition (paper no. 48).

This allegedly new evidence included an expert report by Dr. Richard Callery, a pathologist, concluding Gibson's injuries were "consistent with a single event involving an unsupported fall to a hard surface such as the ground striking the head," *see* Letter Re: Evidence of Actual Innocence, Ex. 1 (12/1/08) (paper no. 51); an expert report by a pharmacologist and toxologist concluding Gibson had alcohol and byproducts of cocaine use in his bloodstream at the time of his death, *id.* at Ex. 2; McKernan's post-arrest medical treatment records reflecting bruises to his thumb and arm, *id.* at Ex. 3; and medical records of McKernan's post-trial visits to a neurologist for a degenerative back condition, *id.* at Ex. 4. Respondents replied that McKernan's request to amend his initial pleading was time-barred and futile, and the proposed evidence was neither new or evidence of McKernan's actual innocence. *See* Response to Letter

Re: Evidence of Actual Innocence (1/23/09) (paper no.53).

## II.  JURISDICTION

A federal court has jurisdiction over a petition for a writ of *habeas corpus* challenging state confinement in violation of the United States Constitution.  AEDPA, 28 U.S.C. § 2241, 2254.  A district court reviews *de novo* portions of a magistrate judge's report and recommendation to which a petitioner objected.  *See* 28 U.S.C. § 636(b)(1)(C).

## III.  STANDARDS OF REVIEW

### A.  Exhaustion and Procedural Default

### 1.  Exhaustion

Before a federal court can grant habeas relief, all available state court remedies have to be exhausted, or there must be an absence of available state corrective process, or circumstances would render such process ineffective to protect the rights of the petitioner.  28 U.S.C. § 2254(b). A petitioner has not exhausted state court remedies "if he has the right under the law of the State to raise, by any available procedure, the question presented."  *Id.* § 2254(c).  In order to satisfy the exhaustion requirement, a petitioner must demonstrate the federal claims in question have been "fairly presented to the state courts."  *Castille v. Peoples*, 499 U.S. 346, 351 (1989).

A state prisoner must "present the state courts with the same claim he urges upon the federal courts."  *Picard v. Connor*, 404 U.S. 270, 276 (1971).  The Supreme Court in *Webb v. Webb*, 451 U.S. 493 (1981), held petitioner did not properly raise or preserve a federal claim in state court, and noted petitioner did not cite to the federal constitution or to federal cases in the state court proceedings.  *Id.* at 496.

> At the minimum, [] there should be no doubt from the record that a claim under a *federal* statute or the *Federal* Constitution was presented in the state courts and that those courts were apprised of the nature or substance of the federal claim at the time and in the manner required by the state law.

(emphasis in original).  *Id.* at 501.

*See also Paullet v. Howard*, 634 F.2d 117, 119 (3d Cir. 1980) (petitioner failed to exhaust

available state judicial remedies when his "argument with respect to prosecutor's opening

remarks was presented to the Superior Court of Pennsylvania as reversible trial error, not as a

constitutional violation").  A petitioner can exhaust state court remedies by presenting a federal

constitutional claim to the Pennsylvania Superior Court instead of the Pennsylvania Supreme

Court.  *See Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004) (quoting *In re Exhaustion of*

*State Remedies in Criminal and Post–Conviction Relief Cases,* No. 218 Judicial Administration

Docket No. 1 (Pa. May 9, 2000) ("Order No. 218")).

### 2.        Procedural Default

When a state court denies a claim because the petitioner failed to comply with a

procedural rule, a federal court generally will not review the claim if the state procedural rule was

adequate, firmly established, and consistently followed.  *See Martinez v. Ryan*, 132 S. Ct. 1309,

1316 (2012).  A federal court may review a defaulted claim if the petitioner shows: (1) the rule

applied was an inadequate basis for the state court decision or not independent of the claim's

merits, *Harris v. Reed*, 489 U.S. 255, 260–61 (1989); (2) "cause for the default and actual

prejudice as a result of the alleged violation of federal law[,]" *Coleman v. Thompson*, 501 U.S.

722, 750 (1991); or (3) absent review, a miscarriage of justice will occur, *id.*

To show cause for the default, the petitioner must demonstrate "some objective factor

external to the defense impeded counsel's efforts to comply with the State's procedural rule."

*Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To show "actual prejudice," the petitioner must

demonstrate trial errors worked to his actual and substantial disadvantage, and "infect[ed] his

entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170

(1982).

To prove a fundamental miscarriage of justice, a petitioner must establish he is actually innocent of the crime by presenting new, reliable evidence of innocence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The petitioner must persuade the district court that, in light of the new evidence, no reasonable juror would have found him guilty beyond a reasonable doubt. *Id.* at 329. A court assessing a claim of actual innocence may consider the probative force of relevant evidence excluded or unavailable at trial. *Id.* at 327–28.

**B.      Merits Standard**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), amended the standards for reviewing state court judgments in federal *habeas* petitions filed under 28 U.S.C. § 2254. AEDPA narrows the ground for a successful habeas petition by mandating deference to exhausted federal claims that have been adjudicated on the merits by the state court, unless the adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d). The petitioner has the burden of making this showing. *Williams v. Taylor*, 529 U.S. 362 (2000).

A state court decision is "contrary to" Supreme Court precedent if the state court reached a "conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413.[2] An "unreasonable application of" Supreme Court precedent occurs

---

[2] Justice O'Connor, writing for the majority with respect to Part II of the opinion.

12

when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts [] of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 519 (2003).  A finding that the state court merely made an incorrect or erroneous decision does not justify relief; the decision must have been unreasonable.  *Williams*, 529 U.S. at 411.  Federal *habeas* review under § 2254(d)(1) requires federal courts to evaluate state court decisions "against  [the Supreme] Court's precedents as of 'the time the state court renders its decision.'"  *Greene v. Fisher*, 132 S.Ct. 38, 44 (2011).

Under AEDPA, state court factual determinations are presumed correct; the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  A state court decision is based on an "unreasonable determination of facts" if the petitioner demonstrates "by clear and convincing evidence" the state court factual findings were "unreasonable in light of the record."  *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011).

## IV.     Discussion

McKernan's *habeas* petition contains three claims for relief based on counsels' ineffectiveness.  This court will review these claims *de novo* since McKernan objected to the magistrate judge's recommendations denying these claims.  In petitioner's amended objections to the R&R, McKernan additionally claims due process was violated when the trial judge failed to recuse.

### A.     Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, a defendant must satisfy the two-prong *Strickland v. Washington*, 466 U.S. 668, 687 (1984), test: (1) counsel performed deficiently; and (2) the deficient performance prejudiced the defendant.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

A defendant has to show counsel performed deficiently by failing to act in an objectively reasonable manner in accordance with professional norms. *Id.* A court must presume counsel's performance "falls within the wide range of reasonable professional assistance." *Id.* at 689. A defendant raising an ineffective assistance of counsel claim has to overcome the strong presumption that the challenged action "might be considered sound trial strategy." *Id. See Michael v. Louisiana*, 350 U.S. 91, 101 (1955).

A defendant must then show deficient performance of counsel prejudiced a defendant since there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The reviewing court has to assess counsel's performance in light of the totality of the evidence. *Id.* at 695-96.

In reviewing a *habeas* petition under AEDPA involving a *Strickland* claim that has been adjudicated on the merits by the state court, "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

**1.    Claim I:       Petitioner's Trial Counsel was Ineffective for Failing to Seek and Secure Relief for the Trial Court's Obvious Bias**

McKernan claims his trial counsel rendered ineffective assistance by failing to claim the petitioner's waiver regarding recusal of the trial judge was not voluntary, intelligent, and knowing. *Pro Se* Habeas Pet. at 9 (paper no. 1). Recommending denial of this claim, the magistrate judge found petitioner: 1) did not establish had he been told the specifics of the trial judge's statements during the robing-room conference he would have requested recusal; and (2) did not show "trial counsel was ineffective for believing himself, and advising petitioner, that the

14

trial judge was likely to be as favorable a trier of fact as he could expect."  R&R at 22-23 (paper no. 14).  The court agrees with the magistrate judge that given the totality of the circumstances, petitioner's testimony that he would have requested recusal had he been told the specifics of the trial judge's statements during the robing-room conference is not credible, although in hindsight he may believe it sincerely.

McKernan objected to the magistrate judge's recommendation and alleged his Sixth Amendment right to effective assistance of counsel was violated when trial counsel failed to seek and secure relief for the trial court's obvious bias.  Am. Pet'r's Obj. R&R at 36 (papers no. 38-40).  He argued trial counsel was ineffective by: (1) failing to inform petitioner of all the facts surrounding the robing-room conference between the victim's family, the judge, the district attorney, and defense counsel; (2) permitting petitioner to make an "uninformed" waiver of his right to an impartial tribunal; and (3) failing to submit a motion challenging the judge's impartiality.  *Id.*

a.      **Defense Counsel's Discussions With Petitioner Regarding the Robing-Room Conference**

Whether or not counsel informed petitioner of every statement that took place in the robing-room conference cannot be ascertained from the record because petitioner's meetings with counsel were private and unrecorded.  A review of the record makes it clear petitioner was advised of the substance of the robing room conference by his attorney, the trial judge, and the prosecutor.  N.T. 7/15/98 at 235, 239, 246.  Defense counsel also testified he informed McKernan about the important things that were discussed in the robing-room conference so McKernan could make his own informed decision as to how to proceed.  N.T. 11/24/08 at 27-28, 36, 39, 41, 42.

15

Petitioner now alleges counsel should have required "an on-the-record reading of the in-camera transcript to the defendant." *Pro Se* Obj. R&R at 28 (paper no. 25). The Supreme Court has never held an improper *ex parte* conference between the judge, prosecutor, defense counsel, and victim's family mandates an on-the-record reading of the in-camera transcript to the defendant. Petitioner has failed to allege any credible facts supporting his claim; i.e., he clearly and reasonably relied on the advice of counsel but now claims he would have requested recusal of the trial judge, despite the advice of counsel, had he been told all of the judge's statements during the robing-room conference.

### b.     Defense Counsel's Decision Not to Submit a Motion to Challenge the Judge's Impartiality

The state court trial and this court's evidentiary hearing show defense counsel's recommendation for petitioner to remain with the trial judge and his decision not to submit a motion to seek recusal were objectively reasonable. Defense counsel was sufficiently aware of the robing-room conference to make a reasoned assessment of the trial judge's impartiality. Counsel acknowledged the proceedings were unorthodox, but relied on his experience trying cases before that trial judge to make an informed judgment on the probability of success under those circumstances. Defense counsel's recommendation and decision were not unreasonable trial strategy, especially in light of the state court's determination, whether right or wrong, that there was no actual bias.

### c.     Petitioner's Waiver of His Right to Recuse the Trial Judge

After conferring with his counsel, McKernan engaged in a waiver colloquy in which he explicitly confirmed he wished to proceed with Judge Richette presiding and stated his decision to waive recusal of the trial judge was his own uncoerced choice. N.T. 7/15/98 at 246-247.

In *U.S. v. Olano*, 507 U.S. 725, 733 (1993), the Supreme Court stated, "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake."[3]  While a judge who participates in an *ex parte* conference with the prosecutor, defense attorney, and victim's family during a bench trial might be acting improperly by creating an appearance of bias, clearly established federal law does not mandate recusal of the judge.

In *U.S. v. Rosenberg*, 806 F.2d 1169 (3d Cir. 1986), defendants, convicted for possession of firearms, explosives and false identification documents, argued the district court judge's bias or prejudice affected their sentencing.  The Court of Appeals found the defendants' allegations did not prove bias disqualifying the judge.  *Id.*  "A disqualification motion filed after trial and judgment is usually considered untimely unless good cause can be shown for the delay, for otherwise a party alleging bias would always await judgment in the hopes of a favorable decision."  *Id.* at 1174, 1173 n.3.  Other courts have similarly recognized the principle, "[A] defendant cannot take his chances with a judge and then, if he thinks that the sentence is too severe, secure a disqualification and a hearing before another judge."[4]

McKernan was satisfied with his discussions with his counsel about the robing-room

---

[3] Legal scholarship supports the proposition there is no bright line test to determine whether a particular constitutional right is waivable.  *See, e.g.*, Jazon Mazzone, *The Waiver Paradox*, 97 Nw. U. L. Rev. 801 (2003) (describing and contrasting two different doctrines determining whether a constitutional right may be waived); Edward L. Rubin, *Toward a General Theory of Waiver*, 28 UCLA L. Rev. 478 (1981) (surveying the present law of waivers).

[4] *U.S. v. Owens*, 902 F.2d 1154, 1156 (4th Cir. 1990); *Taylor v. United States*, 179 F.2d 640, 642 (9th Cir. 1950).  *See also Davis v. Cities Service Oil Co.,* 420 F.2d 1278, 1282 (10th Cir.1970) ("Promptness in asserting disqualification is required to prevent a party from awaiting the outcome before taking action.") (citations omitted); *In re United Shoe Machinery Corp.,* 276 F.2d 77, 79 (1st Cir.1960) ("One of the reasons for requiring promptness in filing [recusal motions] is that a party knowing of a ground for requesting disqualification, cannot be permitted to wait and decide whether he likes the treatment that he receives"); *In re United Shoe Machinery Corp*, 276 F.2d 77, 79 (1st Cir. 1960) ("We cannot permit a litigant to test the mind of the trial judge like a boy testing the temperature of the water in the pool with his toe, and if found to his liking, decides to take a plunge.").

conference and the recommendation to proceed with the same trial judge when he waived any right to recusal of the trial judge prior to the presentation of the defense case.  It was not until after the trial and judgment that McKernan, unhappy with the outcome, accused his counsel of providing ineffective assistance in not moving to disqualify the trial judge for bias.  Defense counsel's recommendation that McKernan waive recusal of the trial judge was not unreasonable or unsound trial strategy since he did not know the judge who would preside over McKernan's trial if he had asked for recusal.  *See Strickland*, 466 U.S. at 689.

McKernan is not entitled to *habeas* relief because the state court's determination on the issue of ineffective assistance of counsel was not contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1).

**2.      Claim II:      Trial Counsel was Ineffective for Failing to Investigate and Present Eyewitness Evidence to Rebut the Commonwealth's Evidence of Intent**

McKernan claims Harrison rendered ineffective assistance when he failed to interview and call three favorable witnesses at trial.  McKernan argues these witnesses would have supported his claim of self-defense and rebutted the prosecution's proof of intent required for a first-degree murder conviction.  *See Pro Se* Habeas Pet. (paper no. 1).  In support of this claim, McKernan attached to his petition affidavits signed by each of the witnesses.  *Id.* at Ex. A/1, Ex. A/2, Ex. A/3, Ex. B, Ex. C/1, Ex. C/2  (paper no. 1).  The magistrate judge determined this claim was procedurally defaulted because it was never presented to the Pennsylvania Superior Court, and the one-year statute of limitations applicable to PCRA petitions, 42 Pa. C.S. § 9545(b), had run.  *See* R&R at 9–10 (paper no. 14).  The court could not excuse default because McKernan was not able to show cause and prejudice or a fundamental miscarriage of justice.  *Id.*

McKernan concedes this claim is procedurally defaulted but objects to the magistrate

18

judge's finding of no fundamental miscarriage of justice if the claim were not considered. He argues the court should excuse default because the affidavits would compel a reasonable juror to acquit him of first-degree murder, even if that juror would still convict him of a lesser offense.

McKernan attached two signed statements from Karl Jahr: one from November 1998 and another from October 2000. *See Pro Se* Habeas Pet., Ex. A/1, Ex. A/2, Ex. A/3 (paper no. 1). Each statement recites the same facts, and the October 2000 affidavit further avers Jahr was prepared to testify in McKernan's defense. *Id.* Jahr says he observed Gibson "coming at" McKernan with a pry-bar and then saw McKernan hit Gibson in the chest with a bat. *See Pro Se* Habeas Pet., Ex. A/1 (paper no. 1). After he had been hit, Gibson was "facing up and his head was by the curb." *Id.*

Mr. Jahr's statements conflict with the medical examiner's trial testimony. As summarized by the Superior Court:

> The medical examiner testified that Gibson died as a result of blunt force injuries. The injuries were consistent with 'having sustained two separate blows to his body with an aluminum baseball bat, one of those blows being behind the right ear and the other blow being to the small of the back. . . . [The impact behind the right ear] led to swelling of the brain or increased pressure which then cause[d] the vital centers of the brain stem to be pushed down and have their blood supply cut off, and once that happen[ed] there [was] no more heartbeat or respiration.' Trial Transcript, 7/14/98, at 93.

*Commonwealth of Pa. v. McKernan*, No. 2814 PHL 1998, 776 A.2d 1007, at 3 (Pa. Super. Ct. Feb. 16, 2001) (unpublished). Jahr's statements also conflict with Thompson's testimony; Thompson testified McKernan hit Gibson in the head with the bat as Gibson was moving toward the car with his back to McKernan. N.T. 7/16/98 at 371–72.

McKernan attached a statement from Donna Jahr, Karl Jahr's mother. *See Pro Se* Habeas Pet., Ex. B (paper no. 1). Ms. Jahr does not state she witnessed the altercation. *Id.* Instead she

19

avers she has known McKernan for at least ten years and that her son, Karl, might have relevant evidence and would testify on McKernan's behalf.  *Id.*  Nothing in Ms. Jahr's statement supports McKernan's contention he acted in self-defense or with a different mental state.

Florence Bast ("Bast") provided two signed statements and avers she witnessed the altercation between McKernan and Gibson.  *See Pro Se* Habeas Pet., Ex. C/1, Ex. C/2 (paper no. 1).  Watching from her bedroom window, Bast saw Gibson with a crowbar in his hands; it appeared he intended to hit McKernan's car window.  *See Pro Se* Habeas Pet., Ex. C/1 (paper no. 1).  Gibson then began hitting McKernan with the crowbar.  *Id.*  McKernan used the bat to block the crowbar blows, pushed Gibson away, and told him to leave.  *Id.*  Bast avers she left the window to get dressed and, by the time she got outside, the police were arresting McKernan and Gibson was lying in the street.  *Id.*  Bast does not aver she witnessed the final moments of the altercation.  She did not observe whether McKernan struck Gibson in the chest, as McKernan claims, or in the head, as the medical examiner testified.  Bast's statement, if believed, establishes Gibson as the initial aggressor, but it does not describe the fatal blow.

The first officer on the scene, Officer Steven Hellmuth, testified that only three people were on the scene when he arrived: Rogers, Thompson, and Gibson.  N.T. 7/14/98 at 101, 115. Rogers, Thompson, and McKernan each testified, and none mentioned Jahr, Ms. Jahr, or Bast as present at the scene when the incident occurred.  N.T. 7/14/98 at 142–95 (Rogers testimony); N.T. 7/16/98 at 361–94 (Thompson testimony); *id.* at 422–539 (McKernan testimony).

During post-conviction review, McKernan was granted an evidentiary hearing to present testimony of these witnesses if called at trial.  At the hearing, McKernan's PCRA counsel was unable to present the witnesses:

20

[DEFENSE COUNSEL]: I contacted Ms. Bast last Wednesday night. I believe I spoke to her over the phone. Although, she made a statement to the defendant's family indicating certain facts, she indicated to me that she could not testify in conformity with that statement; therefore, she would not back up what I had alleged in the amended petition. . . . She is not here today. I told her not to come because I thought it would be fruitless to bring her in and just have her say that she would not testify in conformity with the statement. That's also true with Karl Jahn [sic]. He also said that he could not testify, to give testimony that would jive with what was in his statement and I said the same thing to him.

N.T. 12/15/03 at 4.  McKernan was made aware of this:

THE DEFENDANT: . . . [T]hese witnesses who had signed statements stated I did not hit him in the head, I hit him in the chest.

THE COURT: But those witnesses have now recanted.

THE DEFENDANT: I still have signed statements.

THE COURT: It doesn't matter. They won't come to court, and they say to your lawyer that they will not back up those statements; is that right?

[DEFENSE COUNSEL]: That's correct, your Honor.

THE COURT: So there we are.

* * * * *

THE COURT: It's one thing to say that your lawyer didn't call witnesses that would have testified on your behalf, that has merit. And that's why I was holding this hearing today, to bring these witnesses in. Now, these witnesses won't show up.

N.T. 12/15/03 at 7–9.

The proffered statements do not show a fundamental miscarriage of justice excusing procedural default.  The most compelling evidence, the statement of Karl Jahr supporting McKernan's blow-to-the-chest version of events, directly conflicts with the testimony of the

21

medical examiner and Thompson.  A reasonable juror could have heard both versions of the events and still found McKernan guilty of first-degree murder beyond a reasonable doubt.

3. **Claim III:** **The State Court's Rejection of McKernan's Ineffective Assistance of Counsel Claim Based on Calling Thompson at Trial is Contrary to or an Unreasonable Application of Clearly Established Federal Law**

On direct appeal**,** McKernan claimed Harrison rendered ineffective assistance by calling Thompson as a defense witness without preparing or interviewing him.  Thompson testified at trial McKernan hit Gibson in the back of the head with a bat when Gibson attempted to get into the car.  *Commonwealth of Pa. v. McKernan*, No. 2814 PHL 1998, 776 A.2d 1007, at 7 (Pa. Super. Ct. Feb. 16, 2001) (unpublished).  Previously, in a statement to the police, Thompson stated Gibson was facing McKernan with a raised crowbar when McKernan struck Gibson with the bat.  *Id.*  The Superior Court addressed this claim on direct appeal:

> The record establishes that in his original statement to police, Thompson said that the victim raised a crowbar up above appellant and that appellant hit the victim while the victim was facing him.  The fact that Thompson changed his testimony could not have been predicted by counsel. Counsel did his best to impeach the witness with the prior statement, but Thompson insisted that Gibson only held the screwdriver in his hand and did not raise it to appellant.  Further, Thompson stated that he was certain Gibson's back was turned when appellant struck him.  Counsel cannot be faulted for calling a witness who, on a prior occasion, gave statements in support of appellant's theory of the case.  Rather, counsel's strategy of calling a witness to corroborate his client's testimony was eminently reasonable.

*Id.* at 7–8.

McKernan now challenges the Superior Court decision and claims: (1) Harrison performed deficiently by calling Thompson without any preparation; and (2) Thompson's testimony severely prejudiced McKernan's defense.  The magistrate judge found Harrison's

22

performance was reasonable and McKernan suffered no prejudice; McKernan objects to both findings.

McKernan argues minimal investigation into Thompson's statement would have unearthed the damaging nature of his testimony, but McKernan offered no factual basis for this conclusion nor any evidence Harrison failed to speak to Thompson before calling him as a witness.  Harrison was not caught off-guard by Thompson's testimony; Harrison was ready with the police statement and attempted to impeach Thompson on whether Gibson was facing McKernan and raising his weapon in a confrontational manner when he was struck.  N.T. 7/16/98 at 377–81.

Even if Harrison knew Thompson would recant when he called Thompson to the stand, McKernan has not rebutted the presumption that Harrison's actions were "sound trial strategy." *See Strickland v. Washington*, 466 U.S. 668, 689 (1984).  If Thompson had not testified, his prior statement to the police that McKernan acted in self-defense would not have been presented to the factfinder.  As the magistrate judge reasoned, Harrison could have found it necessary to call Thompson as a witness, no matter what he might say, to get his prior statement in evidence.

Even if counsel performed deficiently, the deficient performance did not prejudice McKernan.  *See Strickland*, 466 U.S. at 687.  The medical examiner's testimony cast doubt on McKernan's self-defense claims regardless of whether Thompson testified, and the state judge would likely have reached the same verdict either way.  The Superior Court decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

**B.      Claim IV:      The Trial Court's Bias Constituted Structural Error that was Presumptively Prejudicial**

In Petitioner's amended objections to the magistrate judge's R&R, McKernan argues trial court bias constituted structural error depriving him of due process under the Fourteenth Amendment.  McKernan never previously contended trial judge bias denied federal constitutional due process.

### 1.    Unexhausted Judicial Bias Claim

McKernan first argued judicial bias in his direct appeal to the Superior Court from the judgment of sentence of the Court of Common Pleas.  *See* Appellant Br. Direct Appeal. Although McKernan challenged the trial judge's decision not to recuse for bias, McKernan never contended judicial bias deprived him of due process under federal law.  McKernan did not cite the federal constitution nor any cases relying on the Due Process Clause of the federal constitution.  Rather, McKernan argued the trial judge's failure to recuse was improper under Pennsylvania law and, to the extent he raised a federal constitutional claim at all, counsel was ineffective for not requesting recusal of the trial judge under *Strickland v. Washington*, 466 U.S. 468 (1984).  The Superior Court, finding neither trial court error nor ineffective assistance of counsel, held that McKernan's recusal claim failed.

McKernan next raised claims of judicial bias in his appeal of the Court of Common Pleas dismissal of his PCRA petition.  He claimed: (1) his decision to refuse the trial court's recusal offer was not a knowing, voluntary, and intelligent waiver of a constitutional right; and (2) trial, appellate, and post-conviction counsel were ineffective for failing to raise the waiver issue.  *See* Appellant Br. PCRA Appeal.  McKernan again alleged the trial judge's failure to recuse was improper under Pennsylvania law.  His federal constitutional claims concerned whether waiver of his right to request recusal of the trial judge was proper, the Supreme Court definition of

24

"waiver" in *Johnson v. Zerbst*, 304 U.S. 458 (1938), and ineffectiveness of counsel under

*Strickland*. The Superior Court concluded the trial judge had no actual bias after evaluating the

trial judge's bias under Pennsylvania law "to determine whether [the trial judge's remarks]

indicate that the judge [was] so prejudiced or biased that h[er] mind [was] not open to conviction

by the last evidence presented." PCRA Appeal Op. at 7. The Superior Court stated:

> We have read the entire transcript and find no support for [the conclusion that
> the trial judge was biased]. Throughout both the Commonwealth's and the
> defense's presentation of their respective cases, the court requested repetition
> or further clarification of or expansion upon the witnesses' testimony. At the
> close of appellant's case, the trial court asked both attorneys to argue the
> issue whether the verdict should or should not be first degree murder based
> on recent case law from our supreme court and on a legislative amendment
> that allows baseball bats to be considered deadly weapons. Basing the first
> degree murder conviction on the use of a deadly weapon on a vital part of the
> victim's body, the court found incredible appellant's testimony that he struck
> the victim in self-defense while the victim faced him, and only struck him
> once, on the side of his chest, when the medical evidence indicated the victim
> had been struck on the back of his head behind the right ear and across the
> small of the back. We find support for the trial court's conclusion in our
> review of the evidence, and therefore find that the judge was not so
> prejudiced or biased that her mind was not open to conviction by the last
> evidence presented.

*Id.* at 7–8 (citation omitted).

Not until McKernan's objections to the magistrate judge's R&R did he allege trial judge

bias deprived him of due process under federal law. McKernan did not contend the trial judge's

failure to recuse deprived him of due process under federal law in his direct appeal to the

Superior Court or in his appeal of the Court of Common Pleas dismissal of his PCRA petition.

McKernan also failed to present this claim in his pro se *habeas corpus* petition. Since McKernan

did not fairly present his judicial bias claim in the state courts, his claim is unexhausted because

he has not provided the state courts with the requisite opportunity to review it.

25

### 2.   Procedural Default of Judicial Bias Claim Not Excused

If state court remedies are not exhausted, a writ of *habeas corpus* should not be granted unless one of two exceptions to exhaustion applies: "an absence of available State corrective process[,] or...circumstances exist that render such process ineffective to protect the rights of the applicant." § 2254(b)(1).  In McKernan's amended objections to the magistrate judge's R&R, McKernan argues his substantive claim of judicial bias was exhausted on direct appeal, but if the court nevertheless finds petitioner failed to exhaust the judicial bias claim on direct appeal, the claim should still be considered exhausted because it would be futile to raise this claim in state court.  Am. Pet'r's Obj. R&R at 33 (papers no. 38-40).  McKernan then alleges that even if the claim is procedurally defaulted in state court, it should be reviewed in federal court since a defaulted claim can be reviewed if a conviction is a fundamental miscarriage of justice.  *Id.*

A fundamental miscarriage of justice occurs in only the "extraordinary" and "extremely rare" case in which a petitioner demonstrates he is actually innocent of the crime by presenting "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 321, 324, 327 (1995).  The petitioner must persuade the district court, in light of the new evidence, it is more likely than not, no reasonable juror would have found him guilty beyond a reasonable doubt.  *Id.* at 327-29.  Here the magistrate judge concluded McKernan failed to meet the actual innocence standard because the proffered affidavits (the only new evidence offered to him) were not "so reliable that no reasonable trier of fact who heard the evidence would have convicted [McKernan]."  R&R at 10-11 (paper no. 14).  McKernan alleges the R&R "wrongly limits the issue to whether the new evidence would have compelled a total acquittal on a perfect

26

defense of self-defense" instead of considering whether he was actually innocent of first-degree

murder, even if guilty of third-degree murder.  Am. Pet'r's Obj. R&R at 46 (papers no. 38-40).

In *Glass v. Vaughn,* 65 F.3d 13, 16 (3d Cir. 1995), the petitioner alleged he was actually

innocent of first-degree murder because of his diminished capacity and should have been found

guilty of third-degree murder only.  The Court of Appeals assumed *arguendo* the actual

innocence test applied in a non-capital case where "there is evidence that defendant committed

the crime but argues that he or she was responsible for a lesser degree of guilt" even though "the

Supreme Court has not decided whether the actual innocence test is applicable in a noncapital

case when there is evidence that defendant committed the crime but argues that he or she was

responsible for a lesser degree of guilt."  *Id.* at 16.  The *Glass* court then rejected petitioner's

actual innocence claim since the court could not "conclude that no rational juror would have

voted to convict [petitioner] of first-degree murder."  *Id.* at 17.

McKernan's counsel moved to amend his petition for a writ of *habeas corpus* to include

alleged new evidence relevant to McKernan's assertion he is "actually innocent" of first-degree

murder: the pathologist expert report of Chief Medical Examiner for the State of Delaware, Dr.

Richard T. Callery, opining the decedent's injuries were caused not by a blow to the head with a

baseball bat, but an "un-supported fall to a hard surface such as the ground striking the head"

(Ex. 1); the pharmacologist and toxologist expert report of Dr. Gary L. Lage, concluding the

decedent was "markedly intoxicated" by alcohol at the time of the altercation rendering him

unsteady and likely aggressive (Ex. 2); and new medical records allegedly supporting

McKernan's account of the incident (Ex. 3, Ex. 4).  *See* Letter Re: Evidence of Actual Innocence

from Counsel for Petitioner (12/1/08) (paper no.51).  McKernan argued the proffered affidavits

27

and this new evidence, with the evidence presented at trial, would make it "more likely than not that a reasonable juror would not find McKernan guilty of first degree murder beyond a reasonable doubt." Am. Pet'r's Obj. R&R at 47 (papers no. 38-40).

If we assume *arguendo* that the actual innocence test applies, taking into account the extremely high burden a petitioner must meet to show actual innocence, the evidence, including the new evidence identified, does not establish no reasonable juror would have convicted McKernan of first-degree murder.[5] The proffered affidavits possess the same weaknesses revealed in earlier proceedings. The new evidence would still require McKernan to explain Thompson's testimony that he witnessed McKernan strike Gibson in the back of the head when Gibson turned to enter the car and would be compared with the testimony of Dr. Liberman that the injuries were the result of a blow. After considering the alleged new evidence presented by McKernan, and the other evidence, McKernan has not established no reasonable juror could review the new evidence and convict him of first-degree murder. McKernan is unable to establish a claim of actual innocence; his procedural default of the judicial bias claim is not excused.

### 3.    Judicial Bias Claim Would Fail on the Merits

McKernan would not be entitled to relief even if the court were to consider the merits of McKernan's judicial bias claim under our limited AEDPA role. Consideration would depend on whether the state court decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, [as] determined by the Supreme Court of the United States" at

---

[5] As of the date of this opinion, neither the United States Supreme Court nor the Third Circuit Court of Appeals have decided whether the actual innocence test applies to a case where the petitioner does not argue he did not commit the crime but argues he is responsible for a lesser degree of guilt. As the Third Circuit has done, we will assume *arguendo* the actual innocence test could extend to the degree of guilt in a non-capital case.

the time of the state court review.  *See* 28 U.S.C. § 2254(d); *Greene v. Palakovich*, 606 F.3d 85, 97-98 (3d Cir. 2010) ("The text of § 2254(d)(1) supports using the date of the relevant state-court decision for determining 'clearly established Federal law.'").

In *In re Murchison*, a Michigan judge had acted as a "one-man judge-grand jury" and compelled two witnesses to appear before him to testify in secret about suspected crimes as permitted by Michigan law.  349 U.S. 133, 133-35 (1955).  The judge concluded one witness had committed perjury, and the other witness had refused to answer the judge's questions without counsel.  *Id*.  The judge then tried, convicted, and sentenced the witnesses in open court for contempt.  *Id*.  The Supreme Court, reversing the Michigan Supreme Court, held the judge violated due process because the judge, having been part of the accusatory process, could not have been completely disinterested in the conviction or acquittal of the witnesses.  *Id.* at 137. The Court stated, in *dicta*, "[a] fair trial in a fair tribunal is a basic requirement of due process, [and] ... our system of law has always endeavored to prevent *even the probability* of unfairness." *Id.* at 136 (emphasis added).

The Court of Appeals considered *Murchison* after enactment of AEDPA in *Johnson v. Carroll*.  369 F.3d 253 (3d Cir. 2004).  A Delaware jury found the defendant guilty of aggravated menacing and a weapon-related crime.  *Id.* at 254-55.  Before sentencing, the trial judge voluntarily informed counsel a former state prosecutor, James Liguori, Esq. ("Liguori"), had spoken to him about the defendant at a social event.  *Id.* at 255.  Liguori had commented the defendant was a "bad guy" who had "threatened" the prosecutor and his family, and he "wanted to see that justice was done."  *Id.*  Defense counsel did not object to the *ex parte* communication between Liguori and the judge because the alleged incident was "nothing new."  *Id.* at 256.  The

29

judge did not recuse and sentenced the defendant to 18 years in prison as a habitual offender. *Id.* at 255. On *habeas* review, the district court cited *Murchison* and found the judge's failure to recuse *sua sponte* created an "appearance of bias" in violation of due process. *Id.* at 260.

The Court of Appeals remanded the case with directions to dismiss the *habeas* petition because neither *Murchison* nor any other Supreme Court case supported the district court position. *Id.* at 262. The holding of *Murchison* concerned "the basic constitutional principle of prohibiting a judge from adjudicating a case where he was also an investigator for the government"; the language about preventing "even the probability of unfairness" was merely *dicta*. *Id.* at 260. "Even a generalized reading of the [*Murchison*] holding. . . does not stand for the conclusion, drawn by the District Court and [the petitioner], that a judge with an appearance of bias, without more, is required to recuse himself *sua sponte* under the Due Process Clause." *Id.* The petitioner appealed, and the Supreme Court denied certiorari. 544 U.S. 924, 125 S. Ct. 1639, 161 L. Ed. 2d 483 (2005).

Due process includes a right to an unbiased judge.[6] In the absence of actual judicial bias, the Supreme Court has held constitutional due process is violated only if: (1) the judge had a pecuniary interest in reaching a conclusion[7]; or (2) the judge had been the target of personal

---

[6] *See, e.g.*, Johnson v. Mississippi, 403 U.S. 212, 216 (1971) ("Trial before an unbiased judge is essential to due process"); Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases…it preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done,' Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 172 (1951), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him"); Bracy v. Gramley, 520 U.S. 899, 904-905 (1997) ("Due Process Clause clearly requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case.").

[7] *See, e.g.*, Turney v. Ohio, 273 U.S. 510 (1927); Ward v. Village of Monroeville, 409 U.S. 57 (1972); Gibson v. Berryhill, 411 U.S. 564 (1973).

abuse, insult, or criticism from a contemnor.[8]  *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

In *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), a defendant corporation appealed a $50 million dollar jury verdict.  *Id.* at 874.  While the appeal was pending, the chief executive officer of the corporation, Don Blankenship ("Blankenship"), supported candidate Brent Benjamin ("Benjamin") for a seat on the appellate court by contributing the $1,000 statutory maximum to Benjamin's campaign committee, donating almost $2.5 million to a political organization ("And For the Sake Of the Kids") supporting Benjamin and opposing an incumbent candidate running for reelection to the court, and spending just over $500,000 on independent expenditures supporting Benjamin such as direct mailings and advertisements.  *Id* at 873.  Benjamin won the election and the plaintiffs moved to disqualify him "based on the conflict caused by Blankenship's campaign involvement."  *Id.* at 873-74.  Justice Benjamin declined to recuse.  *Id.*  The appellate court then reversed the $50 million verdict against the defendant in a 3-to-2 decision with Justice Benjamin in the majority.  *Id.*  The court granted a rehearing, and Justice Benjamin once more refused to recuse.  *Id.* at 875.  The appellate court reversed the $50 million verdict against the defendant in a 3-to-2 decision with Justice Benjamin in the majority.  *Id.*

The Supreme Court, holding Justice Benjamin should have recused since the extreme facts of the case caused the probability of actual bias to rise to an unconstitutional level, reversed the judgment and remanded for further proceedings.  *Id.* at 886-87.  Although Justice Benjamin had explained why he had no actual bias, the Court noted "the Due Process Clause has been implemented by objective standards that do not require proof of actual bias."  *Id.* at 883.  The

---

[8] *See, e.g.*, Taylor v. Hayes, 418 U.S. 488, 501-503 (1974); Mayberry v. Pennsylvania, 400 U.S. 455 (1971).

Court defined these objective standards by requiring an inquiry into whether, "under a realistic appraisal of psychological tendencies and human weaknesses [the interest] poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.* at 883-84.  The Court held "there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id.*  The Court noted the case, like *Murchison*, dealt with "extreme facts" creating an unconstitutional probability of bias.[9]  *Id.* at 886-87.

In *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971), a defendant was sentenced in a state criminal contempt proceeding to an unprecedented sentence of 11 to 22 years by the same judge the defendant had vilified during defendant's trial in state court.  The Supreme Court, vacating the contempt convictions, stated, "[B]y reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor." *Id.* at 466.  "The vital point is that in sitting in judgment on such a misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance.  These are subtle matters, for they concern the ingredients of what constitutes justice." *Id.* at 465.

---

[9] It is unclear whether the probability of bias standard announced in *Caperton* applies only to "financial support in judicial elections, or applies to judicial recusal questions more generally." *See id.* at 893 (Roberts, C.J., dissenting).  The *Caperton* court did not hold due process requires a judge to recuse because of the mere appearance of bias.  *Compare Johnson v. Carroll*, 369 F.3d 253 (3d Cir. 2004).  Also, the "clearly established Federal law" in § 2254(d) refers to the holdings of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (emphasis added).  The Superior Court decided the judicial bias claim in 2005, four years before *Caperton*.  To the extent *Caperton* changed the judicial bias standard, it is inapplicable to McKernan's claim.

The trial judge's robing-room conference created an appearance of bias, but there is no "clearly established Federal law" holding the appearance of bias alone requires recusal. *See Johnson v. Carroll*, 369 F.3d 253, 260 (3d Cir. 2004). Nor is there a Supreme Court case directly holding a judge's *ex parte* conference with a victim's family during a bench trial creates an unconstitutional probability of bias.

We disapprove of the judicial conduct at issue. The trial judge's decision to question the Gibsons about the webpage showed poor judgment and damaged the appearance of fairness and impartiality. Her statements during the conference regarding the merits of the case and her personal statement sympathetic to victims of crime undermined the court's neutrality. Speaking with members of the victim's family outside the presence of the defendant during a bench trial (at the conclusion of the prosecution's case but before any defense evidence) is offensive judicial conduct even if defendant's counsel was present.

But in the present review of a *habeas* petition brought under AEDPA, if this claim was properly exhausted in state courts, the question would be limited to whether such a violation was "clearly established" by Supreme Court precedent; it was not. The state court decision finding no actual bias was not "contrary to . . . clearly established Federal law[,]" nor did it "involve[] an unreasonable application of . . . clearly established Federal law[.]" *See* 28 U.S.C. § 2254(d). The Superior Court reviewed the record and found the trial judge asked for clarification of defense testimony and considered argument on whether the verdict should have been less than first-degree murder. *See* Appellant Br. PCRA Appeal at 7. Based on this evidence, a reasonable factfinder could have concluded the trial judge had no actual bias. The state court decision if incorrect, was not objectively unreasonable. *See Williams*, 529 U.S. at 411. Claim IV would fail

33

on the merits.  McKernan is not entitled to relief on this ground.

## V.   Certificate of Appealability

The court may grant a certificate of appealability where a petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This "substantial showing" standard includes, "showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983)).  Although the court finds McKernan is not entitled to relief, he has made a substantial showing the trial judge's failure to recuse violated the due process requirement of a fair trial by a fair tribunal and he might be actually innocent of first-degree murder, if not some degree of homicide.  The court will issue a certificate of appealability.

## VI.   Conclusion

The court will overrule McKernan's objections; the petition for a writ of *habeas corpus* will be denied.  A certificate of appealability will be issued.  The affidavits of the three witnesses McKernan alleged would have provided testimony supporting his self-defense contention and the alleged new evidence of actual innocence have been filed on record for the Court of Appeals to consider with the certificate of appealability.  An appropriate order follows.

34