```
                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                               - - -

PAUL McKERNAN,                   :  CIVIL ACTION NO. 06-2118
          Petitioner            :
                                :
          v.                    :  Philadelphia, Pennsylvania
                                :  November 20, 2008
JOHN A. PALAKOVICH,             :  2:10 o'clock p.m.
          Respondent            :
. . . . . . . . . . . . . . . . :

                             HEARING
               BEFORE THE HONORABLE NORMA L. SHAPIRO
                 UNITED STATES DISTRICT COURT JUDGE

                               - - -


APPEARANCES:

For the Petitioner:        CLAUDIA VAN WYK, ESQUIRE
                           BILLY H. NOLAS, ESQUIRE
                           Federal Community Defender
                           Office
                           601 Walnut Street
                           Suite 545 West
                           Philadelphia, PA  19106


For the Respondent:        JOSHUA SCOTT GOLDWERT, ESQUIRE
                           Philadelphia District Attorney's
                           Office
                           3 South Penn Square
                           Philadelphia, PA  19107-3499


                               - - -


Audio Operator/ESR:     Mark Rafferty

Transcribed by:         Paula L. Curran, CET

         (Proceeding recorded by The Record Player digital
sound recording; transcript produced by AAERT-certified
transcriber.)

                   Laws Transcription Service
                      48 W. LaCrosse Avenue
                       Lansdowne, PA 19050
                          (610)623-4178
```

2

1          (The following occurred in open court at 2:10

2    o'clock p.m.)

3          THE DEPUTY CLERK:  All rise, please.

4          THE COURT:  Good afternoon, please be seated.

5          ALL:  Good afternoon, your Honor.

6          THE COURT:  We're trying to cope with the fact that

7    Mr. Mckernan was not brought down as counsel requested.  The

8    question becomes shall we postpone all together?  Shall we

9    attempt to do what we can do without him?  Shall we see if

10   they can get him on video?  What is your thought?

11         MR. NOLAS:  What we were discussing, your Honor, was

12   the possibility, if the Court has it available, just

13   reconvening on Monday.  Mr. Harrison is here.  He's available

14   on Monday.  Counsel for the parties are available.

15         THE COURT:  No, I'm available today and the question

16   is, why we can't proceed?  Why does he have to be here?

17         MR. NOLAS:  Well, in part, because Mr. Mckernan will

18   be testifying, in part --

19         THE COURT:  Well, we could have him testify later.

20   Why can't we hear -- I understand who else is testifying, Mr.

21   Harrison?

22         MR. NOLAS:  Mr. Harrison, who was trial counsel and

23   we wanted Mr. Mckernan present when Mr. Harrison was

24   testifying because they were there together, at the time and

25   I think he has a right to be present for that.

1        THE COURT:  I don't know why he has a right to be
2   present at a habeas.  This is a civil proceeding.  He has a
3   right to be present at every stage of the criminal
4   proceedings against him and indeed, he wasn't present for
5   every stage of the criminal proceedings and that's the issue
6   here.  And he wasn't present for part of the in-chambers
7   conference, since you look so puzzled.  And for part of the
8   in-chambers, neither was his attorney.  His attorney was
9   present for most of it, but not for all of it and we have a
10  transcript of everything that happened, except for two
11  off-the-record conferences.  There's no transcript of them
12  and no explanation of why.
13       MR. NOLAS:  If I may make --
14       THE COURT:  Yes, we could, how about if we could
15  have him present by video to listen to his testimony and then
16  he could testify later.
17       MR. NOLAS:  If, sure, if that could be arranged.
18  The only thing is, if we were, I don't know if the Court does
19  have time Monday available if we were going to --
20       THE COURT:  Well, I didn't, I had a TRO, but I've
21  been informed that it's settled, so I might have the time
22  available.
23       MR. NOLAS:  If we could do that, that would, as a
24  practical matter, take care of everything.  Because as I
25  said, Mr. Harrison will be available on Monday.  We're

4

1    available on Monday.

2           MR. HARRISON:  Right here, your Honor.

3           THE COURT:  You're available?  You have a very busy

4    trial schedule.

5           MR. HARRISON:  Yes, but I'll accommodate the Court.

6           MR. NOLAS:  It's just, I'll tell your Honor, we feel

7    a little uncomfortable proceeding without Mr. Mckernan, in

8    light of the record and what transpired in the State Court,

9    so we'd like to have him here.

10          THE COURT:  Well, I was agreeable to have him come.

11   I feel a little uncomfortable that Graterford wouldn't bring

12   him down and the question is how I'm going to get him down

13   here on Monday or whether we all have to go to Graterford.

14          MR. NOLAS:  Well, we have phone numbers and we can,

15   your Honor can do a one-line writ and we can make sure it's

16   in hand.

17          THE COURT:  They don't honor, I had a writ for

18   today.

19          MR. NOLAS:  Yes, your Honor.

20          THE COURT:  Call them and see if they can get him

21   down.  I'll defer the evidentiary hearing and I'll hear

22   argument on the legal questions now.

23          MS. VAN WYK:  Yes, your Honor.

24          THE COURT:  As I understand the legal questions, as

25   a matter of procedural due process, you can have a valid

5

1    waiver if the defendant is fully and completely informed.

2    That's the issue here, the Superior Court made an error in

3    its statement that Judge Richette conducted a colloquy.  As a

4    matter of fact, the DA conducted the colloquy.  She didn't

5    seem to think one was necessary.  Although, when she was

6    reminded that maybe they should get Mr. Mckernan in or

7    consult him, she agreed.  But it wasn't on her initiative.

8            There is, however, structural error, which is a

9    matter of substantive due process.  That was not addressed by

10   the State Courts and it's clear from the Supreme Court that

11   there's some things that cannot be waived.  The issue is

12   whether one of them is the right to be present at all stages

13   of a criminal trial.  I'm glad you agree with me and that you

14   shake your head whenever I say something, but it really

15   doesn't help.

16           The issue is whether the right not to be present at

17   a trial can be waived unless you have full and complete

18   knowledge and the whole issue of -- and the issue, of course,

19   is whether a trial judge is exercising trial judgment when

20   she or he gives the right to determine her recusal to the

21   victim's mother.  Or for that matter, to the DA or the

22   victim.  I always thought it was a judicial decision.

23           The Supreme Court has cases on recusal for financial

24   bias and it's clear that that's a basis for recusal.  It

25   hasn't had a case on personal bias since, I think, 1970 or

6

1    very early.

2         The Supreme Court has just granted cert in Capperton

3    (ph) v. Massey, which will illuminate, at least when you have

4    to recuse for a financial bias, but they might have something

5    to say about personal bias, as well as financial and the

6    issue is whether we should await the decision in this case to

7    see if the Supreme Court has any wisdom in that if they

8    impart it by June.  They took quite a bit of time to decide

9    whether to accept cert in that case and we don't know why.

10   Whether the court was divided, whether there was going to be

11   a dissent or whether it was too hot a potato for them to

12   touch.  Are you familiar with the facts of that case?

13        MS. VAN WYK:  No, your Honor.

14        THE COURT:  Are you?

15        MR. GOLDWERT:  I am, your HOnor.

16        THE COURT:  Well, let me just summarize by saying

17   that in a decision arising from the Supreme Court of West

18   Virginia, several members of the Supreme Court had a personal

19   relationship with the CEO of a company that had a

20   multi-million dollar verdict against it.  I forget whether it

21   was $50 or $72 million.  It was overturned by that Supreme

22   Court, but there was a pending motion for reconsideration.

23   One of the justices recused because his picture was in the

24   paper drinking on the Riviera with Mr. Massey, I think.

25   Maybe it was Massey, but at any rate, the principal of the

7

1    coal company.  The chief justice, who had received $3 million

2    for his campaign, which was the largest contribution he had

3    received and he was elected, he refused to recuse and the

4    case was then -- setting aside the verdict was affirmed by a

5    4-3 decision of the West Virginia Supreme Court.  The Chief

6    Justice, himself, personally chose the judges who would

7    accept -- who would sit instead of the two who had recused.

8    He didn't put it on the wheel and take judges at random.

9         That's the matter before the Supreme Court.  There's

10   been quite a bit of national interest in it.  Not because of

11   our problem, really, but because of the problem of funds

12   going to the election of justices of State Supreme Courts, I

13   think.

14        But at any rate, the issue involved as I see it, is

15   when a judge is required to recuse, but it's clearly, well, I

16   think it's clearly financial interest.  The Chief Justice

17   Benjamin wrote a long opinion finally about why he recused,

18   which I'll confess I haven't read.  But that's essentially

19   what's before the Court and the source of my knowledge comes

20   from an amicus brief filed by the American Bar Association

21   and personal conversation with a member of the West Virginia

22   Supreme Court.  Okay.

23        MR. NOLAS:  Your Honor, before we proceed more

24   formally to the argument --

25        THE COURT:  Yes.

1          MR. NOLAS:  -- can Mr. Harrison, can I tell he's

2    okay for Monday and we can send him on his way?

3          THE COURT:  I haven't decided yet, so the answer is

4    no.

5          MR. NOLAS:  Oh, I thought you did, sorry.

6          THE COURT:  I want to see if Mr. Mckernan is

7    available Monday.  What's the point?  If he can't come

8    Monday, we have to either postpone it indefinitely and I'm a

9    little troubled by how long the case has taken to come to

10   decision.  If I affirm, there's no particular problem, he

11   stays in jail the rest of his life, I guess.  If I reverse

12   and there has to be a new trial, it's quite a ways after the

13   events and that is troubling, but may be inevitable.  One

14   would wonder why Mr. Gilson wasn't concerned about this turn

15   of events and the likelihood that the verdict would be upset.

16         MR. NOLAS:  I'm sorry?

17         THE COURT:  Pardon?

18         MR. GOLDWERT:  I didn't hear what the Court said

19   about Mr. Gilson?

20         THE COURT:  Wasn't he the DA?  Pardon?

21         MR. GOLDWERT:  I didn't --

22         THE COURT:  I said one would wonder why he wasn't

23   concerned at the time about the unusual events and whether

24   the verdict might not stand under the circumstances, that's

25   what I said.  I would suppose, wouldn't you wonder about a

1    trial judge in the middle of the trial, calling in the

2    prosecutor, the mother of the victim and the counsel to have

3    a discussion about her conduct?

4         MR. GOLDWERT:  And it's my understanding that Mr.

5    Gilson was attempting, as best he could, to make sure that

6    the defendant was apprised of what was going on here and to

7    make sure that if this case was to proceed, that it was to

8    proceed with the defendants and the defense's knowledge of

9    what was going on.

10        THE COURT:  Yes, I --

11        MR. GOLDWERT:  Because, of course, the trial had

12   already commenced.  Jeopardy had already attached and this

13   was a situation in which, I'm confident that had recusal been

14   requested and had the defense agreed that there was a

15   manifest necessity for a mistrial, I believe Mr. Gilson would

16   testify that he would not have contested if the defense

17   agreed that a mistrial was manifestly necessary.

18        THE COURT:  Is he expected to testify?

19        MR. GOLDWERT:  He is, your Honor.

20        THE COURT:  Well, I guess we shouldn't speculate,

21   either you or I, about what he would have done if this

22   situation were different.  A DA is certainly in a difficult

23   position when a judge, before whom he appears, repeatedly

24   calls him into chambers and conducts a somewhat irregular

25   colloquy.

1          MR. GOLDWERT:  And I believe and although, of

2     course, I believe his testimony will speak for itself, I

3     believe that Mr. Gilson acted as he did in part to try to

4     make sure that the record was as clear as could be about what

5     was happening in order to try to prevent any additional

6     uncertainty about who knew what and when.

7          THE COURT:  I think that's true.  I think the

8     transcript shows that he was doing his best under what I'm

9     describing as unusual circumstances.

10         MR. GOLDWERT:  Right, my -- I was responding to I do

11    not think that Mr. Gilson was not concerned about having to

12    retry it.  I think that his concern was if he wanted to retry

13    the case, he wanted to do it there and then with recusal

14    requested, as opposed to ten years after the fact.  I think

15    that's what Mr. Gilson's concern was.  I believe that's what

16    he'll testify.  That was all that I thought, your Honor.

17         THE COURT:  All right, well, in the meantime, I

18    raise the question of whether we can go on with an argument

19    about the legal issue.

20         MS. VAN WYK:  I'm prepared to do that, if you wish,

21    your Honor.

22         THE COURT:  Because I think to some extent there's a

23    certain portion of the legal issue that goes to the fact that

24    no matter what happened, the facts you both stipulate to do

25    not permit what happened.  In other words, my concern, one of

1    my concerns is first of all, was there a valid waiver.  That

2    depends on the facts that we will hear.

3            The second concern is, is it waivable?  That's the

4    issue.  Is there structural error so serious that it can't be

5    waived under the Constitution of the United States.  That's

6    what I decide.  I don't decide if Mr. Mckernan is guilty or

7    innocent.  I don't decide -- well, in a sense, I have to

8    decide what Judge Richette should or shouldn't have done.

9    But the issue for me is, can you possibly say it was a fair

10   trial in these circumstances?  And that's why I allowed you

11   to brief it, because you did not discuss structural error.

12   You discussed procedural due process.  You did not discuss

13   substantive due process and I thought that I should give both

14   of you a chance to argue that before I thought about a

15   decision.

16           I mean, my law clerk and I have had some very

17   interesting discussions and we're uncertain about that.  I

18   thought that I would value the discussion of counsel.  So,

19   now I'm asking you, do you wish to argue that?  We can do

20   that.  You would agree Mr. Mckernan doesn't have to be

21   present for a legal argument, wouldn't you?

22           MS. VAN WYK:  Yes, your Honor.

23           MR. GOLDWERT:  I do, your Honor.

24           THE COURT:  Very well.  Do you wish to make your

25   argument?

1          MS. VAN WYK:  I do have some points I want to make,

2     your Honor.  We have two claims related to this colloquy, as

3     your Honor knows from our pleadings.  One is the structural

4     error of the judge's bias.  The second one is ineffective

5     assistance relating to counsel's conduct respecting that

6     bias.  As to the ineffectiveness portion of my legal

7     argument, I submit that would be more appropriate to --

8          THE COURT:  I won't hear that until I've heard Mr.

9     Harrison and Mr. Mckernan.

10          MS. VAN WYK:  Exactly, your Honor.

11          THE COURT:  And I'm not going to hear whether there

12     was a valid waiver.  I'm only hearing the argument that there

13     are some things you can't waive.

14          MS. VAN WYK:  Okay --

15          THE COURT:  And with the supposition that a biased

16     judge is one of them.  And we have to determine the bias from

17     the colloquy itself, from the transcript.

18          MS. VAN WYK:  I agree with you.

19          THE COURT:  There is no dispute.  Neither of you

20     will attack the transcript, will you?  I mean, that was

21     recorded as it happened, is that correct?

22          MS. VAN WYK:  Yes, your Honor, I'm not attacking

23     that.

24          THE COURT:  Is that correct?

25          MR. GOLDWERT:  Correct, your Honor.

13

1          THE COURT:  All right, so that we can assume that

2    the facts are as recorded on the morning of day two, July 15,

3    1998?

4          MS. VAN WYK:  That's right, your Honor, to the

5    extent they're reflected in the transcript.

6          THE COURT:  Well, I'm not going to hear any -- you

7    have no evidence to contradict the transcript, do you?

8          MS. VAN WYK:  No, on the other claim, we have some

9    evidence that will go to what was said outside chambers,

10   outside the judge's robing room. But it's not -- that would

11   go to the ineffective assistance point.

12         THE COURT:  Or to the waiver?

13         MS. VAN WYK:  That's right.

14         THE COURT:  My point is, assuming this happened as,

15   you are Mr. Goldwert?

16         MR. GOLDWERT:  Yes, your Honor.

17         THE COURT:  As he said after jeopardy attached,

18   after the prosecution had presented its case, Judge Richette

19   summoned the mother of the decedent and later, the brother of

20   the decedent to her chambers for a discussion with the

21   prosecuting attorney and for most of it, the defense

22   attorney, but not the defendant himself.

23         MS. VAN WYK:  That's right, your Honor.

24         THE COURT:  He was consulted later --

25         MS. VAN WYK:  Correct.

14

1          THE COURT:  -- after the decedent's mother said she

2     had no objection to continuing the trial.

3          MS. VAN WYK:  That's right.

4          THE COURT:  And the subject, there were really two

5     subjects.  One was why Judge Richette wasn't as bad as the

6     website said, I mean, was in defense of herself.  And the

7     other subject was did they, in view of, what was their wish

8     or to recuse, which she said she would if Mrs. Gibson wanted

9     her to.  It's a Gibson and a Gilson, so it's a little

10    confusing.  All right, that's what I wish you to argue.

11         MS. VAN WYK:  Okay, your Honor.  Well, you know, as

12    to the matters your Honor has reviewed already, we're in 100

13    percent agreement that Judge Richette did lose her

14    impartiality.  That this was a due process violation and that

15    judicial bias that amounts to a violation of due process of

16    law is structural error that's presumptively prejudicial.  I

17    don't think the right to an impartial tribunal is a right

18    that can be waived.

19         Moreover, I think --

20         THE COURT:  What is the evidence of her impartiality

21    when she kept declaring that she would be able to give a fair

22    trial?

23         MS. VAN WYK:  I think it's the surrounding

24    circumstances, where she --

25         THE COURT:  Would you be more specific?

1       MS. VAN WYK:  -- certainly, your Honor.  Multiple

2  times, she offered to the victim's family the option of

3  deciding whether she was to continue or not.  Repeatedly

4  described her --

5       THE COURT:  Is there any basis under the law for a

6  victim's family having the right to recuse a judge?

7       MS. VAN WYK:  None that I'm aware of, they are not a

8  party, your Honor.

9       THE COURT:  What else, if anything?

10      MS. VAN WYK:  She talked repeatedly about her

11 concern for victims' rights.  She made remarks such as the

12 6th Amendment provides defendants' rights, nothing provides

13 victims' rights.  She talked about the fact that she taught a

14 course in victimology at St. Joseph's University and there

15 are a number of remarks of that type that we quote in our

16 petition.  She made remarks about the facts of the case.  She

17 told the victim's family that she believed this was a

18 horrible, horrible murder, I really do.  She also told the

19 victim's family that they were fortunate because in many

20 murder prosecutions, no one will come forward, but in this

21 case, they had Mr. Rogers.  Mr. Rogers being the one

22 prosecution witness who actually testified about the

23 altercation between Mr. Mckernan and Mr. Gibson.

24      THE COURT:  I don't believe she vouched for the

25 credibility of Mr. Rogers, at that time.

1      MS. VAN WYK:  No, I don't think you could call it

2   vouching, but I believe you could call it a comment on her

3   opinion about the merits of the case and that was an occasion

4   when she, once again, characterized this as a murder.  She

5   did that twice.  She did it in the first remark I just quoted

6   and this one.  And of course, the defense's position was that

7   this was a case of self defense or alternatively, a case of

8   manslaughter and not murder.

9      THE COURT:  So, it wouldn't have been, in other

10   words, if she used the word homicide it would be different,

11   but she used murder.

12      MS. VAN WYK:  That certainly would have ameliorated

13   that particular remark, but of course, we're not basing our

14   argument on just those remarks, your Honor.  We're also

15   basing them on the repeated expressions of sympathy about the

16   experience that the victim's family had with the district

17   attorney's office.  Her repeated efforts to get the district

18   attorney to vouch for her to the victim's family.

19      THE COURT:  Not surprisingly, the district attorney

20   announced several times she was a very fair judge.

21      MS. VAN WYK:  That's right, your Honor.  Further,

22   we're concerned, very concerned about two more remarks that

23   come near the end of the colloquy.  She told them that she

24   was worried that they were going to criticize her in the

25   newspaper.  She said, I don't want to open the Daily News,

1    your Honor and read the usual BS.  I think that was certainly

2    a remark that betrayed a lack of temperance and impartiality.

3            Later, during the ex parte portion of the colloquy,

4    David Gibson, Mark Gibson's brother, apologized to the judge

5    for offending her and told her just redline whatever offends

6    you and I'll take it off and I'd like you to write up your

7    thoughts on victimology and I'll post them in your defense on

8    the website.

9            THE COURT:  There's no evidence she ever did that,

10   is there?

11           MS. VAN WYK:  I haven't found any.  I have taken a

12   look at the website.  It's still on the internet and I put it

13   in our appendix.  The comments, she was reading aloud and you

14   know, I'm only able to infer.  Apparently, she had a printout

15   of the website that she was reading from because she was

16   quoting extensively and I don't find those comments there

17   anymore.  So, you know, apparently, the Gibsons were

18   satisfied with the result and David Gibson must have removed

19   them, but you know, I have no way of knowing for sure what

20   happened.  I just know the website's still there, but the

21   remarks that offended her are no longer on the website.

22           THE COURT:  There is no evidence that she actually

23   edited their website, which is what I asked you.

24           MS. VAN WYK:  No, no, your Honor.

25           THE COURT:  They made the offer, but we don't know

18

1     if --

2           MS. VAN WYK:  They made the offer.

3           THE COURT:  -- she decided to accept the offer.

4           MS. VAN WYK:  I don't know.  But I do know that that

5     offer was on the table during the balance of the trial and I

6     think that's another piece of evidence that the Court can

7     look to in deciding whether, in fact, she lost her

8     impartiality.

9           THE COURT:  Well, I suppose once she found the

10    defendant guilty of first degree murder, she didn't feel the

11    need to justify her conduct anymore.

12          MS. VAN WYK:  That could be, your Honor.  I have no

13    way of knowing.

14          THE COURT:  But we have no evidence of whether she

15    accepted the offer.  Is there anything else?

16          MS. VAN WYK:  A couple of things.  I think when the

17    Court rules on this claim, your Honor should address whether

18    the claim was exhausted in State Court.  We submit that it

19    was, relying on a case that's in our pleading at page 33,

20    called Evans v. Court of Common Pleas, which says one of the

21    ways a defendant can exhaust claims in State Court is to

22    allege -- of having an affect well within the mainstream of

23    constitutional litigation.  This claim was raised on direct

24    appeal and the direct appeal brief does exactly that.  The

25    brief stated the pattern of facts that overlaps with the same

1  fact we are alleging before your Honor.

2         It talked about the judge's comments on the

3  evidence.  The remark about this was a horrible murder and I

4  believe the remark about Jill Rogers, talked about the fact

5  that she was a good Catholic, that she taught victimology,

6  that she was part of the national movement and referred to

7  the sum total of her other -- what the brief characterized

8  her other off-the-wall comments.

9         I believe this whole complex of facts is right in

10  the mainstream of the kinds of facts that have led the

11  Supreme Court, in the past, to find that a judge is biased

12  and those cases are cited toward the beginning of point one

13  in my brief.  And in addition --

14         THE COURT:  I don't recall the Superior Court

15  discussed this at all.  They treated it as entirely as an

16  issue of waiver.  And they were of the view that he was fully

17  and completely informed, because they felt Mr. Harrison told

18  them what happened.  But they didn't mention that there were

19  times when Mr. Harrison wasn't there and couldn't have known

20  what happened.

21         MS. VAN WYK:  They did not mention that.  They did

22  say at the very end of the opinion, they say we find neither

23  trial error nor ineffectiveness.  They discussed both and if

24  they don't really separate --

25         THE COURT:  We're discussing whether the issue of

1    structural error was exhausted or indeed, whether it has to

2    be exhausted.

3              MS. VAN WYK:  Yes, I do not -- the word structural

4    error does not appear in the pleadings on the direct appeal.

5              THE COURT:  The concept is there are some things so

6    awful, it can't be a fair trial as contemplated by the --

7              MS. VAN WYK:  That is correct.

8              THE COURT:  -- Constitution of the United States.

9              MS. VAN WYK:  And this case, Evans talks about one

10   of the basis for finding whether a sufficient argument was

11   made, is whether the kind of facts that are alleged and

12   underlying the claim are those that are in the mainstream or

13   that kind affects.  And it's just been pointed out to me

14   that, in fact, on the direct appeal, the brief does assert

15   specifically that the trial court was biased --

16             THE COURT:  Ah.

17             MS. VAN WYK:  -- yes.

18             THE COURT:  All right, thank you.

19             MS. VAN WYK:  And I should just say that

20   alternatively, even assuming the Court were to find that

21   there was no exhaustion on direct appeal, it can never the

22   less, treat the claim as exhausted because, step one, if we

23   were to go back now to exhaust, it would be futile in State

24   Court and we're asserting a fundamental miscarriage of

25   justice because, number one, Mr. Mckernan's actual innocence

1  of first degree murder.  And number two, in our view, a trial

2  before a biased tribunal would be a fundamental miscarriage

3  of justice.

4        THE COURT:  Thank you.

5        MS. VAN WYK:  So, that's all I have on that point.

6        MR. GOLDWERT:  First thing, your Honor, with respect

7  to fundamental miscarriage of justice --

8        THE COURT:  Would you please speak into a

9  microphone?

10        MR. GOLDWERT:  Sorry.  First thing, your Honor, with

11  respect to fundamental miscarriage of justice --

12        THE COURT:  Yes.

13        MR. GOLDWERT:  -- the witnesses --

14        THE COURT:  No, you can sit down.  The microphone

15  here is --

16        MR. GOLDWERT:  Sorry.

17        THE COURT:  -- directly in front of you so I can't

18  see your face.  Thank you.

19        MR. GOLDWERT:  With respect to fundamental

20  miscarriage of justice, the witnesses who purportedly show

21  his actual innocence of first degree murder are witnesses who

22  -- there was a pecuniary hearing scheduled for this where

23  post-conviction counsel told the trial court, told Judge

24  Richette, your Honor, I'm sorry, I know you brought the

25  petitioner down for this.  I cannot put these people on the

1    witness stand because after speaking with them, it has become

2    clear to me that they cannot testify consistently with their

3    written statements that seem to support his case.  I can't

4    put them on and I told them don't come to court because it

5    would be futile to have them come to court to just repudiate

6    their favorable statements.  And I can't have them perjure

7    themselves.

8              THE COURT:  I didn't ask for oral argument on

9    ineffective assistance of counsel.

10             MR. GOLDWERT:  No, that goes to the argument about

11   default, because they say that it's --

12             THE COURT:  We're talking about the bias of the fact

13   finder, whether you can have a fair trial with a judge who is

14   infected with bias.

15             MR. GOLDWERT:  I understand that, but they argue

16   that as it gets into default, the default is excused because

17   of a fundamental miscarriage of justice.  That evidence being

18   these witnesses, who post-conviction counsel said I have

19   determined that I can't put them on the witness stand because

20   they can't testify.

21             THE COURT:  Well, you're correct, fundamental

22   miscarriage of justice really means actual innocence and

23   there is no convincing evidence of actual innocence, at

24   least, of some kind of homicide.  Whether everyone would

25   think this is first degree murder, under the testimony I've

1    read, I suppose it's questionable.  But I don't sit here to

2    correct errors of fact finders in the State Court.

3              MR. GOLDWERT:  No, I --

4              THE COURT:  It's only constitutional error.

5              MR. GOLDWERT:  No, I understand that, but my point

6    was just that in terms -- if we get to default, I don't think

7    this Court can properly consider evidence that given the

8    opportunity, post-conviction counsel explicitly refused to

9    present to the State Courts -- given a hearing of that very

10   purpose, because he said I've determined I can't put them on

11   the witness stand.

12             THE COURT:  All right, let's assume it was not

13   exhausted, but that you don't require exhaustion for

14   fundamental error.

15             MR. GOLDWERT:  I think, your Honor, that that is not

16   correct.  I think that structural error, all that means is

17   that when a claim of a certain kind of error is properly

18   raised and properly preserved, it means that no harmless

19   error analysis is possible if the Court and even from the

20   Twombly decision from Ohio, which is perhaps like the

21   paradigmatic conflict of interest case where the mayor judge

22   was compensated only in the event that his trial resulted in

23   convictions.  That was a case in which the Supreme Court

24   noted that the petitioner seasonally objected to the conflict

25   of interest and on his request, was entitled to the judge's

24

1   disqualification.

2          THE COURT:  Suppose a judge was drunk sitting on the

3   bench and the defendant didn't object.  Could that decision

4   be affirmed?

5          MR. GOLDWERT:  If the defense knew or had reason to

6   know that he was drunk?

7          THE COURT:  Well, I suppose you'd have reason to

8   know if you have a drunken judge on the bench if you have

9   reasonable intelligence.

10          MR. GOLDWERT:  I think that in most, at least, in

11   most and perhaps every circuit, I think the answer would be

12   even under the Federal Judicial Recusal Statute, the answer

13   is no.  The objection is forfeited.  You cannot not make a

14   motion for recusal when the basis to make a motion is known

15   and then if you don't like the result, then turn around and

16   say it was error, the judge should have recused.  And in

17   support of that, for example, the Bayliss decision from the

18   2nd Circuit and I will say that I think that that's a bad

19   case, we're far beyond what we have in that case.

20          THE COURT:  Which case?

21          MR. GOLDWERT:  The Bayliss case in the 2nd Circuit,

22   that was a case from about 12 years ago, during the 1996

23   election year, where Judge Bayer of the Southern District of

24   New York --

25          THE COURT:  Oh.

1          MR. GOLDWERT:  -- granted the suppression motion,
2    finding that the --
3          THE COURT:  I'm familiar with that case.
4          MR. GOLDWERT:  -- well and in the face of 200
5    members of Congress, you know, demanding that the President
6    request Judge Bayer's resignation and in the face of threats
7    by the then-Senate Majority Leader for, you know, called for
8    the judge's impeachment, the judge granted a government
9    motion for reconsideration, heard additional new evidence,
10   re-evaluated his views of respective credibility of the
11   police officer and the defendant and denied the motion to
12   suppress.  And then after that, they made a motion for his
13   recusal, alleging both lack of impartiality and lack of
14   appearance of impartiality.  And the judge held both, you
15   know, too late and denied it on the merits, because
16   automatically it would be satisfied about my impartiality.  I
17   have had, I have searched my soul.  I've had discussion with
18   my friends about whether to do it on my own.  I found that
19   recusal is not warranted.
20          It went up on appeal to the 2nd Circuit and the 2nd
21   Circuit said had there been a motion, you know, for recusal,
22   this might have been a close case.  But you know, in the
23   absence of any objection, it's waived or forfeited and as a
24   plain error issue under the Federal Rules of Criminal
25   Procedure, this is not a close case.  And furthermore, you

1    know, furthermore the 2nd Circuit held that counsel wasn't
2    effective because the 2nd Circuit said it might have even
3    considered silent trial strategy to want to proceed before
4    Judge Bayer because counsel might well have thought that
5    despite and maybe even because of the furor that the client
6    would still go off before Judge Bayer's -- in his courtroom.
7    And I think a lot of people were surprised that he reversed
8    his ruling.  I think that a logical --
9           THE COURT:  It was a not a proud moment in the
10    history of the federal judiciary.
11           MR. GOLDWERT:  I understand that and I think a lot
12    of people, you know, were upset about the political attacks
13    that were made on judges that year.  I know that Judge Sirica
14    resigned from the 3rd Circuit citing, you know, in part the
15    political attacks that were made on him and were of similar
16    quality to those made against Judge Bayer and judges
17    elsewhere.  And the 2nd Circuit held in that case and that
18    was a case which just arrived -- a federal criminal case on
19    direct review, no objection in the District Court.  You
20    cannot do it afterward.  The basis to make the motion was
21    known and you didn't make it and it could have been strategic
22    and it would be a real disaster to encourage that, you know,
23    that potential kind of gamesmanship.  And the fact that this
24    kind of thing is capable of manipulation really weighs very
25    heavily against considering that kind of error as plain

1   error.

2           The DC Circuit, this year, in a case --

3           THE COURT:  Wasn't there a case in which a judge was

4   asleep on the bench?  It came up in a habeas.  I haven't look

5   for that, but all right.  Can we go off the record a minute?

6           THE DEPUTY CLERK:  Yes, your Honor.

7           (Discussion off the record.)

8           THE COURT:  ... better to bring him down, but I have

9   to see if it can be done.  All right, what else?

10          MR. GOLDWERT:  I was going to say there are other

11  kinds of errors that are considered structural in nature in

12  the sense that they are said to affect the framework of the

13  trial, where it's not possible to reliably assess what might

14  have happened otherwise.  But I don't think anybody thinks

15  that you don't have to raise those claims, you know and

16  preserve them.  I mean take, for example, a claim that the

17  constitution of the Grand Jury or even a Batson claim, which

18  I think, technically is not considered a structural error.

19  But for present purposes, is sort of similar in the sense

20  that if a Batson objection is found, you don't consider what

21  would have happened, you know, had the Batson -- whether the

22  jury would have convicted if that juror hadn't been there and

23  had another juror been there.

24          THE COURT:  Can you conduct a trial without the

25  presence of the defendant, if he hasn't absconded?  In other

1  words --

2         MR. GOLDWERT:  I don't think, your Honor, I think

3  this is part of the default issue.  I think that that claim,

4  the claim that the in-chambers conference was a critical

5  stage of the proceeding, was a claim that not only was it not

6  raised at any point in the state proceedings, it wasn't

7  raised in the petitioner's habeas proceeding and it sort of--

8  I mean, I realize this is sort of a circular thing about

9  whether or not the Court can just take notice of a claim --

10         THE COURT:  The Supreme Court has said over and over

11  again, that a defendant has to be present at every stage of

12  the criminal proceedings against him and if he isn't present,

13  it's invalid.

14         MR. GOLDWERT:  And the Supreme Court has also

15  repeatedly held that claims of error, I believe, also

16  including claims of errors that fall into the category of

17  structural, I believe, must be raised in State Court

18  proceedings.

19         THE COURT:  All right, so that's the issue.  Is

20  there a case where a defendant was, for example, a defendant

21  has a right to be present at jury voir dire.

22         MR. GOLDWERT:  Correct.

23         THE COURT:  Lots of times they aren't, but if they

24  ask, they have a right to be present.

25         MR. GOLDWERT:  That's right.

1          THE COURT:  The lawyers sometimes try and do it

2     without them at sidebar, but it's perfectly clear they have a

3     right.  The issue is for the plaintiffs, can the plaintiffs

4     find any case that was reversed because the defendant wasn't

5     present and wasn't allowed confrontation or whatever, in

6     which he or she failed to object, but it was nevertheless,

7     held cognizable.

8          MR. GOLDWERT:  Well, your Honor, I was going to say

9     I can narrow this to your Honor's question.  I think the

10    Supreme Court also would say that it would be a structural

11    error, you know, not to have an Article III Judge, you know,

12    conduct jury voir dire and that upon objection, to have a

13    Magistrate Judge do jury voir dire --

14         THE COURT:  That's not -- that's reversible error.

15    That's not waivable.  You're saying that's waivable?

16         MR. GOLDWERT:  I think the Supreme Court has held

17    that that counsel can waive that and that the defendants and

18    the defendant's personal consent to have a Magistrate Judge.

19         THE COURT:  What case, because the reversed Judge

20    Pollak for doing that in my court.

21         MR. GOLDWERT:  I think the case's name is Gonzalez.

22    I think it was 2008, but I can get the citation for your

23    Honor.

24         THE COURT:  Okay.

25         MR. GOLDWERT:  I believe that they held that had the

1    defendant objected, I believe that was the holding, that you

2    know, that would have been one thing, but that there was no

3    reason to think that that was -- that counsel's consent was

4    insufficient, I believe was the holding of that case.

5             THE COURT:  Well, let's look at it.  There's also

6    another problem about consent.  Does it have to be the

7    consent of the client or can counsel consent for the client?

8    And there again, the right of allocution in a sentence, the

9    defense counsel can't agree that the defendant shouldn't have

10   that right.  Now, of course, you may say, well, the defendant

11   has to show he wants it.  The right to a jury trial, counsel

12   can't waive that for the defendant.  The defendant has to do

13   it himself.  So that the issue is can counsel waive the right

14   of his client to be present?  One would wonder.

15            MR. GOLDWERT:  Again, I guess the question, I think,

16   is -- well, first start with the question of whether his

17   presence at the in-chambers conference, assuming that that's

18   part of a claim that was properly before this Court, I am not

19   aware of any Supreme Court decisions that hold that that --

20   it's insufficient to have the lawyer know and that you must

21   get the defendant's personal consent as opposed to the lawyer

22   assent.

23            THE COURT:  Mr. Gilson thought so.

24            MR. GOLDWERT:  Mr. Gilson, no --

25            THE COURT:  Asked to have the defendant himself

1   personally consent.  He didn't agree --

2            MR. GOLDWERT:  No, to recusal.  It didn't -- no --

3            THE COURT:  We're talking about his presence there.

4            MR. GOLDWERT:  No, I think we were talking about is

5   the question of whether to proceed with Judge Richette, not

6   to his presence in chambers.  I think they were separate

7   issues.  The issue about whether this was a critical stage of

8   the proceeding for which --

9            THE COURT:  You're not thinking the judge is a

10   critical stage of the proceedings --

11            MR. GOLDWERT:  It was who the judge --

12            THE COURT:  -- in a non-jury trial?  This is a bench

13   trial.

14            MR. GOLDWERT:  I understand.  But are we talking

15   about the recusal question or are we talking about the -- if

16   we are talking about the recusal question, yes, that's

17   correct.  Mr. Gilson thought it important that the petitioner

18   be, you know, be informed and that he and counsel confer.

19            THE COURT:  Can you say with a straight face, that

20   Mr. Gilson had no concern that Judge Richette called him in

21   for an ex parte conference?

22            MR. GOLDWERT:  Can I say with a straight face that I

23   have no concern?

24            THE COURT:  I mean, I don't have any other case I've

25   ever heard of, where after jeopardy is attached and the

1    prosecution has presented its case, a judge calls in some,

2    but not all of the participants, to talk about whether she's

3    a fair, decent judge and whether they want her out of the

4    case because they think she isn't.  And where she spends half

5    the time justifying her own conduct and telling how concerned

6    she is about victims' rights.  That she is an advocate for a

7    constitutional amendment, that she teaches a course of it in

8    St. Joe's and all this about how she really cares for this

9    woman and feels her pain.

10            MR. GOLDWERT:  To which my answer is that the

11   Court's concerned about Judge Richette's actual bias, the

12   attorneys who appeared before her, who I had appeared before

13   her in homicide cases on numerous occasions before, did not

14   think that Judge Richette's impartiality was, you know,

15   reasonably in question.  Because I think that they -- I don't

16   want to get ahead of the testimony, but I think that what

17   they will say is what was being said to Judge Richette and

18   said by Richette is nothing that hadn't been said for 20

19   years already and that letting-loose-Lisa was something that

20   Judge Rizzo had called her 20 years ago and her response to

21   it that it was ridiculous, that people didn't know what they

22   were talking about, that no, she's not that way.  She cares

23   about victims.  This was something that had been going on for

24   20 years and still, virtually without exception, virtually

25   every trial she conducted was a non-jury trial because the

33

1   universal --

2         THE COURT:  Well, but --

3         MR. GOLDWERT:  -- the universal view --

4         THE COURT:  -- it was that she was letting-loose-

5   Lisa.

6         MR. GOLDWERT:  -- the virtually universal view among

7   Philadelphia's Criminal Defense Bar was that a non-jury trial

8   in her courtroom, was the best place in the entire City of

9   Philadelphia to be and on the basis of this record -- this

10  was something that even during the piciary appeal, even the

11  piciary appeals lawyer had to concede there's no, I mean,

12  obviously counsel had to think that no matter what was said

13  in chambers, no matter what was said to her, by her -- I

14  mean, there's no -- of course, counsel would have thought

15  that no matter what had been said to her or by her, that his

16  best interests would continue to be best served by continuing

17  to proceed before Judge Richette.

18        THE COURT:  Well, of course, we're talking about

19  ineffective assistance of counsel and it might well have been

20  a strategic decision.  However, in this case, the DA had

21  taken the death sentence off the table.  So, it wasn't a

22  question of whether the death penalty could or would be

23  imposed.  It was only a question of a life sentence, which

24  she gave.

25        MR. GOLDWERT:  I think that's right and I think that

1    this was a case and to be blunt, where there was a

2    significant -- where, I mean, first degree murder obviously

3    was a significant possibility.  It was the verdict that was

4    reached.  There was also a significant chance and I think

5    that this is what the testimony will be, of a conviction of

6    third degree murder or voluntary manslaughter and I believe

7    that the testimony will be that defense counsel thought and

8    on the basis of who the judge was, I would argue, reasonably

9    thought that the chances that this defendant would get the

10   best reasonably possible outcome under the circumstances,

11   were maximized by continuing to proceed in front of Judge

12   Richette because I believe that -- because in cases before,

13   she had said similar things, terribly killing or horrible

14   killing or horrible murder, victims' rights and then go on to

15   say, but I find a lack of intent to kill.  Or I find it was

16   voluntary manslaughter.  And I think this is something that

17   lawyers had seen many, many times.  The lawyers who appeared

18   before her and so, I think --

19            THE COURT:  This may have been a strategic decision.

20            MR. GOLDWERT:  Yes.

21            THE COURT:  On the issue of ineffective assistance

22   of counsel.

23            MR. GOLDWERT:  Yes.

24            THE COURT:  The issue would be whether in view of

25   what she said in chambers, such a strategic decision was

1  reasonable.  Or whether an understanding of human conduct

2  would suggest that she would be inclined to prove the website

3  wrong in view of how vigorously she disputed it.  Mr.

4  McKernan, himself, sensed that and raised it, evidently with

5  Mr. Harrison.

6  　　　　　MR. GOLDWERT:  That's right, your Honor and they

7  discussed specifically and specifically and it wasn't as if

8  counsel hadn't thought of this.  Specifically, the concern

9  was and this is really several times that she --

10  　　　　　THE COURT:  You misapprehend my concern, which is

11  not the strategic decision of counsel or whether you and I

12  would have done the same thing.  The issue is whether it can

13  be done.  Whether it violates the Constitution as a matter of

14  fact, regardless of the strategic decision of counsel.

15  That's the issue and it's a troubling one.  Yes?

16  　　　　　THE DEPUTY CLERK:  We can do whatever you want to

17  do.

18  　　　　　THE COURT:  All right, we can have him down on

19  Monday.  Let's do that.

20  　　　　　THE DEPUTY CLERK:  So, you don't want him by video

21  by now?

22  　　　　　THE COURT:  There's no point in having him by video

23  now.

24  　　　　　Mr. Harrison is kindly able to come on Monday?

25  　　　　　MR. HARRISON:  Yes, your Honor.

1          THE COURT:  Very well, thank you.  What time?

2          THE DEPUTY CLERK:  10:00 o'clock.

3          THE COURT:  10:00 is fine.

4          MR. NOLAS:  Your Honor, may I step out for a minute

5    and co-counsel will keep going?

6          THE COURT:  Yes, but do you have a reply?

7          MS. VAN WYK:  To this, your Honor?  No, I'd like to

8    reply to a couple of things Mr. Goldwert has said, if your

9    Honor will let me.

10          THE COURT:  Well, that's what I'm talking about.  He

11   made an argument.

12          MS. VAN WYK:  Okay.

13          THE COURT:  If you wish to reply.  You're excused,

14   Mr. Harrison.

15          MR. HARRISON:  Yes, your Honor.

16          THE COURT:  Thank you.

17          MS. VAN WYK:  A couple of things.  Your Honor was

18   speaking about a case that's in front of the Supreme Court

19   right now.  There's another one that might be closer to our

20   facts on judicial bias called Buntian v. Quarterman, which I

21   notice the Court called for the record in the 5th Circuit and

22   you know, if cert is granted, I'll certainly advise the

23   Court.  But it might shed a little bit more light on this

24   question.

25          Earlier, when I was talking about what was raised on

1   the direct appeal, I was referring to page 22 of Exhibit 3 in

2   our exhibits, that we filed with our objections, where the

3   appellate counsel said that -- it's like two-thirds down the

4   page that Judge Richette violated her obligation to be

5   impartial and she was biased against the defendant, after

6   reviewing a number of factual matters that I call to your

7   attention.

8           Mr. Goldwert talks about the fact that under the

9   Federal Recusal Statute on direct appeal, a failure to object

10  in a timely manner below, you know, was ordinarily fatal.  Of

11  course, I think it's important, number one, that we are not

12  proceeding under the Federal Recusal Statute, this is not a

13  mere statutory claim that we're making.  We're making a

14  fundamental due process claim and I think that should matter

15  and --

16          THE COURT:  Well, it's a constitutional claim.  I

17  have no right to set aside a State Court's verdict for a

18  federal statute.

19          MS. VAN WYK:  That's right.

20          THE COURT:  It has to be the Constitution.

21          MS. VAN WYK:  And I think in the rubric of habeas, I

22  think the appropriate way to analyze the failure to object

23  below is not to treat it as my adversary does, as part of the

24  merits, but to inquire whether there was a procedural default

25  in State Court.  And I don't think there was.  I don't think

1  the Superior Court, on the direct appeal, found that this

2  issue had been raised in a procedurally inappropriate manner.

3  They ruled on the merits and therefore there's no federalism

4  basis to find an independent state ground.  The State Court

5  didn't find a procedural default on the basis that it wasn't

6  raised below.  They reached the merits.  They said there was

7  no trial error and no ineffective assistance.

8           THE COURT:  All right, thank you, I'll hear

9  testimony Monday and closing argument after the testimony,

10  unless there's something else.

11          MS. VAN WYK:  No, your Honor.

12          THE COURT:  Thank you.

13          MR. GOLDWERT:  No, your Honor.

14          THE COURT:  And Mr. McKernan will be here Monday

15  morning.

16          MS. VAN WYK:  Thank you very much, Judge.

17          (Proceeding adjourned 3:00 o'clock p.m.)

18                              *  *  *

CERTIFICATION


     I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


S:/Geraldine C. Laws, CET       Date 1/26/15
Laws Transcription Service